CHICAGO, ROCK ISLAND & PACIFIC RAILROAD COMPANY, appellant, v. DAVID B. LONG and members of IOWA STATE COMMERCE COMMISSION and CITY OF ESTHERVILLE, appellees.

No. 47957.

(Reported in 51 N.W.2d 135)

January 8, 1952.

Rehearing Denied March 7, 1952.

R. L. Read, A. B. Howland and B. A. Webster, Jr., all of Des Moines, for appellant.

Ernest Porter, Commerce Counsel, Earle S. Smith, Assistant Commerce Counsel, and Leo E. Fitzgibbons, of Estherville, for appellees.

Mantz, J.—In its inception the controversy arose concerning the question of the installation of some kind of crossing protection at Central Avenue, Estherville, Iowa, where the same is crossed at grade by the Chicago, Rock Island & Pacific Railroad Company, the complainant herein. We will refer to said railroad company as the Rock Island, or the railroad company. On the 28th day of June, 1948, the city council of Estherville passed a resolution wherein, among other things, it provided that the Rock Island be ordered and directed to place a flagman at said crossing, or to there erect and maintain suitable mechanical signal devices within a reasonable time after notice. There were some negotiations between the said city and the railroad concerning such matter, and on November 20, 1948, there was filed with the Iowa State Commerce Commission (hereinafter referred to as the commission) a petition to require the Rock Island to provide protection for such crossing within a reasonable time. To said petition was attached a copy of the resolution of the city council of Estherville, above referred to. A hearing on said petition was held before such commission February 24, 1949, at which time evidence was offered on behalf of the city of Estherville; also on behalf of the Rock Island. Much of the evidence was stipulated.

This dealt largely with the character of the crossing, the location of the railroad tracks and buildings and the volume of traffic (foot and vehicle) passing thereover. Evidence was offered by the city as to accidents and near accidents at the crossing in question. The evidence on behalf of the railroad related to the efforts of the railroad to determine the kind of crossing protection necessary. It showed that beginning on January 1, 1949, pursuant to official written orders from the railroad company, all engines, trains and cars were required to come to a stop before entering said crossing and that a flagman was to be present to warn and stop highway traffic.

On April 8, 1949, the commission issued an order requiring the railroad to install, operate and maintain at its own expense, on or before December 1, 1949, a flashing light signal with rotating discs at the crossing where the six tracks of the railroad company crossed Central Avenue in said city. It further ordered the city of Estherville to provide adequate street lighting at said crossing. On June 7, 1949, the railroad company petitioned the commission to reconsider and modify the decision and order of April 8, 1949. Therein the railroad called attention to the fact that prior to and at the time of the hearing it had installed and maintained a flagman at the crossing; that it was willing to continue such practice in the future; that such would give adequate protection to the traveling public; that the cost of the erection and maintenance of the signals ordered by the commission would amount to approximately $16,000; that the order of the commission was unjust, unreasonable and inequitable and violated the provisions of section 474.28, Code of 1946, and was in violation of its constitutional rights. On June 20, 1949, such petition to reconsider and modify was denied.

I. After such ruling the Rock Island brought the present action under chapter 474, Code of 1950, and particularly section 474.28, which is as follows:

"Proceedings to vacate order. Any railroad aggrieved at any rule, order, or regulation made by the commission may institute proceedings in any court of proper jurisdiction to have the same vacated. If found by the court, after due trial, not to be reasonable, equitable, or just, and if upon an appeal from any rule, order, or regulation of the commission the complaining railroad

is successful in having such rule, order, or regulation vacated, the aforesaid penalty shall be set aside."

The railroad declared itself aggrieved at the ruling of the commission of April 8, 1949, alleging that such order was unreasonable, inequitable and unjust within the meaning of the above quoted section and asked the court to set aside and vacate the same. It further alleged that the order by the commission was an arbitrary and capricious exercise of the power of the commission and violated the constitutional rights of complainant.

The answer of the commission was a substantial denial of the allegation of the railroad's petition and prayed that the court confirm the order of the commission and that the petition be dismissed. The trial court heard the case on the stipulation of facts and the record made before the commission. Such court entered certain findings of fact and conclusions of law sustaining the order and decision of the commission and dismissed the petition of the railroad. This appeal followed.

II.   Appellant in its brief states: "The questions on appeal are the same as those before the District Court: Is the order reasonable, equitable and just, and is it a valid and constitutional exercise of the power of the Commerce Commission?"

We hold that under the record the order of the commission complained of by appellant was neither reasonable, equitable nor just. The reasons for such conclusion are hereinafter set forth. This holding makes it unnecessary for us to pass upon the constitutional questions raised by appellant. Is the finding by the commission that its order for crossing protection over Central Avenue under the record binding upon this court? We answer in the negative.

In the various briefs other questions are argued, but we think that such are so related to the foregoing that they may be considered together.

We think it is unnecessary to call attention to and review the various legislative steps dealing with the creation of what is now known as the Iowa State Commerce Commission. Such legislative history is clearly and concisely set forth by Justice Miller in the case of Lowden v. Iowa State Commerce Comm., 229 Iowa 526, 528, 294 N.W. 749, 750. In that case there was involved the construction of section 7887, Code, 1935 (now 474.28, Code,

1950). Therein this court held that the proceedings were properly in equity; that in this court it was triable de novo; that the order of the decree of the commission or the court was not necessarily final and that this court was empowered to vacate any order of the commission, "if found by the court, after due trial, not to be reasonable, equitable, or just." See also State v. Des Moines & Ft. Dodge Ry. Co., 84 Iowa 419, 431, 51 N.W. 38, 42; State v. Mason City & Ft. Dodge Ry. Co., 85 Iowa 516, 52 N.W. 490; Smith v. Chicago, M. & St. P. Ry. Co., 86 Iowa 202, 53 N.W. 128; State v. Des Moines & K. C. Ry. Co., 87 Iowa 644, 54 N.W. 461; 33 Iowa Law Review 308.

In State v. Des Moines & Ft. Dodge Ry. Co., supra, this court (Granger, J.) said: "The law in terms makes this proceeding an equitable one, and the reasonableness or justness of an order based on such a state of facts is to be determined from equitable considerations. If the order is enforced, it is, as to its legal bearings, the equivalent of a decree for specific performance of a contract or obligation, and equity does not lend its aid to enforce such a performance where the party seeking enforcement is not injured or prejudiced by the neglect. It is under such circumstances that specific performance becomes oppressive, and is in the proper exercise of a discretionary power refused by the courts."

The language above-quoted was set forth and approved in our holding in the case of Lowden v. Iowa State Commerce Comm., supra, and in so doing this court said at page 531 of 229 Iowa: "We held that there must be some certainty in the evidence. In State v. Des Moines & Ft. Dodge Ry. Co., supra (84 Iowa 419, 51 N.W. 38), we held that, in determining whether an order of the Commission is reasonable and just, the court will determine the question from equitable considerations and that it will not lend its aid where the party seeking enforcement is not injured or prejudiced by the alleged neglect. In Smith v. Chicago, M. & St. P. Ry. Co., supra (86 Iowa 202, 53 N.W. 128), we recognized that the duty of the railroad ordinarily must be one that is imposed by statute. In State v. Des Moines & K. C. Ry. Co., supra (87 Iowa 644, 54 N.W. 461), we held that the owners of the railroad will not be interfered with in the management

of their property if there is no competent evidence of any patron being deprived of reasonable facilities."

III.  The issue as passed upon by the commerce commission and later affirmed by the trial court was one of fact.. Appellee has devoted some argument to the claim that once the commission has decided its decision cannot be questioned on appeal; also, that in a sense its action was legislative. We do not deem it necessary to go into such questions in the face of the statute which provides for hearing evidence and appeal to this court. The statute under which the action is brought provides for "appeal" and it does not limit the court to the scope of the review. It provides that any railroad aggrieved at any rule or order or regulation made by the commission may institute proceedings in any court of proper jurisdiction to have the order vacated. If found by the court after due trial not to be reasonable, equitable or just the court is empowered to set aside or vacate the order. Under the language of the statute and our decisions there can be little doubt that on appeal a trial de novo is contemplated. To hold otherwise would be to render parts of the statute meaningless.

Let us examine the situation as it existed when the controversy arose. This court, in the case of O'Brien v. Chicago, R. I. & P. Ry. Co., 203 Iowa 1301, 214 N.W. 608, stated that under the record the crossing here involved was not peculiarly, unusually dangerous or hazardous. The record shows that the lighting furnished at the crossing was not sufficient. This was shown by the order of the commission directed to the city to furnish adequate lighting. Estherville was a terminal point of the railroad —all trains stopped there. None went through at high speed. The movement of the trains and cars was slow. The highway traffic, local and through, was about 6000 vehicles in twenty-four hours; also there was quite a lot of foot travel. Primary No. 92 went through the city and at the crossing followed Central Avenue. There had been some accidents and near accidents. On one occasion an automobile ran into a train on the crossing but there was evidence from which it could be inferred that the driver of the car was negligent. The appellant concedes that there should be some traffic control at such crossing. In the beginning the question was as to the kind of control which should

be installed—whether by flagman, gates or flashing lights. This situation is evidenced by the fact that the resolution of June 28, 1948, provided two alternatives, first, a flagman, or second, some form of mechanical device. As before stated the resolution ordered the installation within a reasonable time. The evidence shows that in a great many instances cities and localities were demanding grade crossing protection. It also shows that in Iowa there are several thousand grade crossings. In the face of such demands it can readily be seen that it would require time to consider and act upon such claims. To comply with all would entail an enormous expense. Following the resolution it can be reasonably inferred that the matter was being considered from all angles. In December the railroad took action and official orders were received requiring all trains, engines or cars to stop at such crossing and to proceed only with a flagman present. This order became effective January 1, 1949. It was carried out thereafter and with one possible exception there have been no accidents at such crossing. Later the appellant offered to show that the railroad was willing to continue the use of a flagman and the stopping of the trains, engines and cars at such crossing. The evidence further showed that the installation of the electrical and manually operated signals would cost all the way from $9000 to $15,000, depending upon the type furnished. While the record does show some accidents and other near accidents at the crossing prior to the resolution, this could hardly mean that all or many of such were due to the lack of crossing protection. The act of crossing at a railroad grade involves the human element. Driving over a railroad crossing requires care to be exercised by the operator of the vehicle. It is always recognized that there is a hazard at every railroad crossing. Many cases could be cited where vehicles ran into trains going over or standing at crossings. Cases could likewise be cited where drivers either knowingly, carelessly or indifferently ignore warning signs, flashing lights, gates and other warnings.

The City of Estherville, by resolution, asked for a flagman or some mechanical stop signal at such crossing, the same to be installed within a reasonable time. A few months later the railroad installed a flagman and put in effect a rule requiring all railway vehicles to come to a full stop before crossing. There was

evidence in the record that the flagman installation was more effective and afforded better protection than would the mechanical appliances ordered by the commission.

When the complaint was filed against the railroad it can readily be inferred that the railroad was in the process of preparing to comply with the resolution of the city council. The hearing before the commission was then pending, and when it was held and at all times thereafter the railroad was stressing the fact that there was then in operation at said crossing adequate protection to the traveling public. In the face of such a showing we find little in the record to indicate that the commission gave such matter serious consideration. Their ruling seems to be based upon the theory that having ordered the mechanical signal device such finding is final and cannot be questioned on appeal. The railroad does not question the proposition that there is need of adequate protection at the crossing. The traveling public would be entitled to such protection. To require such protection and supervision of its operation would be something within the powers of the commission. The public would be entitled to this. Nothing further could be legally required. At the hearing the commission had before it the resolution of the city council of Estherville. A copy of this was attached to the complaint filed by the commission on November 20, 1948. It likewise had before it the record made, showing that at the hearing before the commission, starting on February 24, 1949, a flagman had been installed at the crossing and that all trains, engines and cars were required to come to a full stop before proceeding over such crossing. At all times the commission and the trial court were fully advised as to the situation at such crossing and what the railroad had done to remedy the condition complained of.

Above we have made brief reference to the case of State v. Des Moines & Ft. Dodge Ry. Co., 84 Iowa 419, 51 N.W. 38, wherein the railroad commission sought to enforce an order of said commission. At the risk of repetition we will set forth more in detail certain matters involved in that case. We think this case is particularly applicable here on the question as to the act of the railroad in having and maintaining a flagman at each of the six crossing tracks and in requiring all railroad vehicles to stop before crossing.

In the initial proceedings in the cited case complaint was made to the commission that the defendant, along with the Chicago, Rock Island & Pacific Railway Company, had not rebuilt or restored six miles of its track from Tara, Iowa, to Fort Dodge, but that the trains from Des Moines to Fort Dodge were using six miles of the Illinois Central railroad tracks from Tara to Fort Dodge. The record shows that the six miles of track of the Illinois Central had been leased to the defendants. The defendants resisted said complaint on the ground that the six miles leased gave adequate service to the traveling public and did not deprive it of any rights and advantages. Defendants further claimed that the cost of rebuilding such track would impose a hardship and unnecessary expense upon defendants. The commission sustained the complaint and ordered defendant (Des Moines & Ft. Dodge Ry. Co.) to rebuild and maintain at its own expense the six miles of track. On appeal the district court affirmed the order of the commission. This court reversed the order. The first sentence of the opinion on appeal is as follows: "The consideration in the case involves findings of fact as well as the determination of questions of law." (On page 427 of 84 Iowa.)

The above quoted language was affirmed in the case of Lowden v. Iowa State Commerce Comm., supra.

In the cited case the trial court in affirming the order of the railroad commission that the line be rebuilt and restored said: " '* * * that the order of the board of railroad commissioners * * * is reasonable and just, and that the defendants in refusing compliance therewith are failing in and omitting the performance of public duties and obligations resting upon them.' " (Also on page 427 of 84 Iowa.)

On appeal to this court the case was tried de novo and the record evidence was reviewed and the effect of the ruling and opinion of this court was that the order of the commission was neither reasonable nor just. The court among other things called attention to the fact that by using the leased track the public would be afforded as good a service as could be afforded on a new and rebuilt road. Also, that to rebuild the road would cost $65,000 and to this would be added annually $7000 for maintenance, and that under the record this expenditure would be of no advantage to the citizens of Fort Dodge. This court held that

under the record the finding of the railroad commission was not final and that the law in effect makes the proceeding in the district court an equitable one and the reasonableness and the justness of an order based upon such a state of facts is to be determined from equitable considerations.

In the instant case the commerce commission apparently gave little weight or consideration to the showing and claims by the appellant that at the crossing in question in the City of Estherville it then had in operation the practice of stopping every train, locomotive or car before moving across the street in question and in having an employee on hand to flag, stop or warn the traffic (either pedestrians or vehicles) and that it proposed to do so in the future. The same may be said as to the expense of the installation ordered by the commission. It seems to us that under the record there could be little question that such crossing precaution would be at least as effective as the warning lights ordered installed by the commission, and at a much smaller expense—the most that could be legally required of appellant to make the crossing safe for the traveling public. We think it should be emphasized at this point that we are primarily concerned with the public travel upon Central Avenue. This does not necessarily require the adoption of the most expensive method of warning or train operation. If there are two or more means of getting protection, each of which is adequate, other factors, such as cost, should be considered. Specifically we do not think it is equitable, reasonable or just to require the railroad to install flashing lights or gates or both at the expense of perhaps $15,000 when adequate protection can be gotten in another way at almost no outlay of money. The record shows and common sense tells us that there are serious difficulties in the way of making flashing light signals sufficient at this particular crossing. There are six tracks crossing Central Avenue, three of which are used for switching. Such a system as ordered by the commission is surely no more efficient than the flagging as proposed and in operation by the appellant. The original complaint called for the installation at the crossing in question of either a flagman or a mechanical appliance. That the city council of Estherville regarded as adequate the placing of a flagman at the crossing in question is shown by its resolution on June 28, 1948. Apparently the com-

mission had the same feeling when it filed the complaint on November 20, 1948. The record shows that the railroad did more than the installation of a flagman at the crossings—it required all its trains, engines and cars to come to a full stop before passing over the crossing. There is in the record evidence that the handling of the crossing by the railroad company was superior to flashing lights and that such gave the traveling public adequate protection.

We hold that under the record and the authorities the ruling of the commission was unreasonable, inequitable and unjust under the provisions of section 474.28, Code of 1950, and should be vacated and set aside. No other question is passed upon.

The case is reversed and it is ordered that the order of the commission be vacated.—Reversed.

THOMPSON, C. J., and BLISS, WENNERSTRUM, SMITH, and HAYS, JJ., concur.

OLIVER, GARFIELD and MULRONEY, JJ., dissent.

OLIVER, J. (dissenting)—I am unable to agree with this opinion.

Section 389.41, Code of Iowa 1946 (1950), provides:

"Cities and towns shall have power to compel railroad companies to place flagmen, or to erect, construct, maintain, and operate suitable mechanical signal devices or gates, upon public streets at railroad crossings, under such regulations as may from time to time be made by the council; provided that in cases where a controversy arises between the railroad company and the council as to the necessity for such flagmen, signal devices, or gates, the matter shall be determined by the Iowa state commerce commission."

Acting under this statute, the city council of Estherville on June 28, 1948, adopted a resolution reciting six tracks of the Chicago, Rock Island & Pacific Railroad Company, used by trains and for switching operations, intersected the city's main street which was also a primary highway and which carried a heavy volume of motor-vehicle traffic by day and night; because of the peculiar physical facts and conditions it was difficult for motorists

to observe trains thereon, the crossing was dangerous and there had been several accidents and near accidents upon it; the railroad should erect and maintain adequate automatic warning and signal devices, which would serve to give an adequate warning, at a reasonable distance from the crossing, to each motorist of trains operating in the vicinity of and across the crossing. The resolution, adopting the language of the statute, ordered the railroad "to place flagmen, or to erect, construct, maintain, and operate suitable mechanical signal devices or gates" upon the crossing, stating the order was an exercise of police power and authority vested in the city council by statute.

November 20, 1948, the city petitioned Iowa State Commerce Commission for a hearing and order requiring protection of the crossing, reciting a copy of its resolution of June 28 had been served upon the railroad June 29, the railroad had refused to provide adequate crossing protection and comply with the resolution, and still refused to do so, and a dispute and controversy existed as contemplated by Code section 389.41. December 15, 1948, the railroad filed answer admitting it "has refused to provide the crossing protection referred to in said resolution" of June 28 and "that a dispute and controversy exists between it and petitioner." The answer alleged also the railroad trains and cars traveled slowly across said intersection; there had been no serious accidents in recent years, and while some collisions had occurred the same had been caused by the negligence of the operators of the motor vehicles involved; automatic signal protection was impracticable at that place; any hazards were due to the volume of highway traffic; the cost of protection should be borne by the city or other public body; to require such at the sole expense of the railroad would violate its constitutional rights; the resolution requiring this was arbitrary, unreasonable and beyond the power of the city council to enact. The railroad prayed that the commission find there was no necessity for the installation of the crossing protection, and if the commission found some type of crossing protection was warranted it should make its order conditioned upon the payment of the cost of installation by the city or other governmental body.

The answer of the railroad admitting its refusal to protect the crossing was made December 15, 1948. This pleading was

never amended. However, at the hearing February 24, 1949, the railroad showed that, on December 31, 1948 (shortly before the hearing), the railroad had issued the following order:

"BULLETIN No. 29.
"TRAIN and ENGINEMEN BULLETIN BOARDS.

"Effective January 1, 1949, all movements of trains or engines with or without cars, over Central Avenue Crossing at Estherville must be protected by a flagman on the crossing preceding the movement. This protection will be afforded by a member of the crew, except a section laborer will protect the movements of Nos. 19 and 20 and engines of those trains over this crossing between 8 a. m. and 5 p. m. daily except Sunday and holidays."

This bulletin does not require a full-time flagman at the crossing. Except for trains flagged by a section laborer, a member of the crew gets off the engine, which stops—"he runs out ahead, flags the crossing, and when the engine goes by he steps on it right in the middle of the crossing."

Prior to the hearing the commission viewed the crossing.

April 8, 1949, the commission made its decision and order, in part, as follows:

"This matter was scheduled for hearing first at Emmetsburg, Iowa, on February 24, 1949, this later being changed to the Emmet County Courthouse, Estherville, Iowa, on the same date. The matter was fully heard and taken under advisement, time being granted to March 5, 1949, to the city for the filing of a written brief; to the railway company to March 15, 1949, for reply; and to March 22, 1949, for final reply of petitioner. These briefs have been filed by the above mentioned parties. Additional information has been submitted by the railroad company as agreed at the time of the hearing.

"Central Avenue (Iowa Hwy. No. 9), 48′ in width with sidewalks on either side, at its point of intersection with six tracks of the railway company in Estherville, Iowa, extends in an easterly and westerly direction, crossing six tracks of the railroad company which extend in a southeasterly to a northwesterly direction and in order named from east to west with approximate spacing

are a passenger main, 27' to freight main track, 16' to passing siding, 85' to two freight house tracks and 74' to an industry track. The grade of the street is slightly descending from east to west. Iowa Highway No. 17 joins No. 9 west of the crossing and some of No. 17's traffic uses this crossing to enter the business district. The passenger depot is located in the southwest quadrant, the freight house in the southeast quadrant of the first three tracks and the street, placing it between these first three tracks and the two service tracks. A produce company building is located on the south side of the street between the two service tracks and the single service track. On the north side of the northeast quadrant, Fourth Street, 45' in width, intersects Central Avenue at a point approximately 55' east of the first track and a hotel is located in the northeast quadrant formed by the intersection of the streets. An elevator and the other buildings are located in the northwest quadrant formed by the intersection of the most westerly service track and Central Avenue. The roundhouse and shops are situated one and one-half blocks north of Central Avenue. Additional tracks extend to points just north of the crossing where they connect with tracks heretofore mentioned. The north end of the Rock Island yards is located some 800' south of the crossing. There are several drives intersecting Central Avenue within the limits of the trackage above described.

"Regularly scheduled railroad traffic consists of one passenger motor train each direction daily, the westward train arriving Estherville at 7:40 a. m. and the eastward leaving Estherville at 4 p. m.; one freight train each direction daily; and one triweekly local freight. Both eastward and westward trains move at a reduced speed over the crossing. There are additionally many switching operations carried on over the crossing for the service of the freight house and industries, as well as engines moving to and from the roundhouse, together with other essential movements in connection with the operation of the railroad. Switching crews are on duty 10 a. m. to 6 p. m. and 9 p. m. to 5 a. m.

"The petitioners introduced testimony by a number of witnesses showing, according to police records, the occurrence of five actual contact accidents at this crossing between July 15, 1946, and April 4, 1948; that many 'near accidents' have occurred

within the last few years, the offer being made to produce some thirty witnesses other than those who testified who had been involved in like instances; that this street carries in addition to the local traffic, that of Iowa Highway No. 9, which constitutes a great volume; that one count taken on September 3, 1948, 7 a. m. to 9 p. m. indicated a volume of 6414 vehicles and 644 pedestrians, during which period 28 train movements occurred; that other traffic counts made in August and September 1948 and in February 1949 substantiated the count of September 3, 1948, indicating a volume of some 400 vehicles per hour during test checks; that eight school busses use the crossing; that the location of buildings, parked automobiles and the spotting of railroad cars interfere with the vision of approaching trains; that there are many vehicles entering Central Avenue within the limits of the crossing which tend to divert the attention of motorists using the crossing; that during the hours of darkness at this crossing a dark object such as a railroad car is not readily discernible to a motorist; that the lights of engines and flagmen are neutralized by bright street lights on either side of the crossing; that the Diesel engines used in the switching service are not so readily seen or heard as are steam engines; and that many employees of the Tobin and Davis packing companies use this crossing daily in going to and coming from work because of the fact that the plants are located on the west side of the tracks while approximately two thirds of the residential section and practically all of the business section of Estherville are located on the east side of the tracks. It was stated that the city had no available funds to contribute toward the protection of this crossing.

"The railroad company showed by testimony that in Iowa on Rock Island lines 178 crossings were provided with protection to the end of the year 1947, 94 of these having been provided at railroad expense and 84 through Federal Aid; that approximately one third of the railroad system is located in Iowa and that there are 2228 crossings not specially protected; and that the railroad company had 130 crossings on a recommended list for protection at the end of the year 1947. Information was offered to show that during the period 1936–1942 practically all of the protection provided at crossings was paid for by Federal Aid funds; that crossings that were protected during that period were chosen on

a basis of hazard without regard to location; that during the war years little protection was placed; and that since the war's end changes in regulations have limited the application of funds for this purpose.

"Information since furnished in letter form by the railroad company, in accord with agreement at hearing, states that during the year 1947 protection was installed at three separate crossings in Iowa at a cost of $13,000; that during 1948 six crossings were protected at a cost of $54,000; that there was carried over in the budget from 1948 to 1949 projects for protection in this state in the amount of $37,800; and that the 1949 tentative budget calls for an expenditure for protection in the amount of $37,663. The cost of maintenance per annum for protective signals was estimated at $200. A copy of Bulletin No. 29, dated December 31, 1948, was introduced which directed train and enginemen as of January 1, 1949, to provide protection at Central Avenue by a member of the crew preceding the movement of trains or engines with or without cars; also that a section laborer would provide protection for the movements of passenger trains Nos. 19 and 20 and the engines of these trains over this crossing between the hours of 8 a. m. and 5 p. m. daily except Sundays and Holidays. It was further stated that trains of necessity move rather slowly over this crossing, not exceeding 10 to 15 mph, this because of passenger trains stopping at the depot and freight trains moving in and out of the yards. An average of about thirty trains per day move over the crossing.

"The cost of protection of the crossing was estimated at approximately $15,000, if flashing light signals with automatic short arm gates were provided; this arrangement consisting of a gate either side of the first three tracks on the east and a flashing light signal located west of the most westerly track; and that the cost would be approximately $10,000 for flashing light signals with rotating stop signs and approximately $9,000 for straight flashing light signals.

"It was additionally stated that applications were constantly being received by the railroad company for the protection of crossings at many locations. The opinion was expressed that the present protection fulfills the need.

"It is conceded by all parties to this controversy that the

highway traffic passing over this crossing is extremely heavy—some 6000 to 8000 vehicles per day. Traffic counts of 1948 by the Iowa State Highway Commission at the west corporate limit of Estherville on Highway No. 9 show a daily volume of 1900 vehicles; at the east corporate limit, 1200 vehicles; and at the south corporate limit on Highway No. 17, 1080 vehicles. This traffic, much of which is through, combined with local traffic, creates the above total, indicating that there is much local traffic. The division of the town and the location of several industries that employ many persons, requiring their crossing of the tracks several times per day, makes the local use of the crossing pronounced. It has been quite conclusively shown in surveys that the volume of accidents follows the trend of volume at both railroad and highway traffic at a crossing. Conversely, heavy railroad and highway traffic will result in accidents somewhat in proportion to the volume of this traffic.

"The average number of railroad movements is approximately thirty per day, which are at comparatively low speed for reasons hereinbefore indicated. There are obstructions, both during the day and at night, which cut off the view of approaching trains and at night the movement of dark objects such as railroad cars is difficult to detect because of darkness of crossings and dark backgrounds on either side. Further, at night drivers of cars moving in either direction are facing bright street lights, resulting in what is termed a 'blind spot' over the crossing. All this results in the possibility of accidents and many of the near accidents, as well as some where actual contact occurred, are attributed to this condition. The recently issued bulletin of the railroad company arranges for protection of various train movements, although the provisions thereof are only in certain respects beyond the scope of the requirements already existing in the operating rules of the railroad company. Advance warning indication that is positive in nature and given sufficiently in advance to the driver of an automobile to afford time for action is not provided under the present protective scheme. We are confident from past experience that the installation of protection at a crossing does result in a reduction of the accident rate.

"Federal Aid funds in recent years, as administered by the Iowa State Highway Commission with the approval of the Bureau

of Public Roads, have been limited in this state for application to crossings falling within limited categories and this crossing does not fall into that classification; therefore, no funds from this source for the protection of this crossing are available at this time. The testimony on behalf of the City of Estherville stated that no funds were available for application to the protection of this crossing.

"This commission in some previous decisions dealing with crossing protection has recognized that the problem of providing such protection is not one for the railroad alone. Present-day traffic on the highways has materially contributed to the need for better protection, as much so as it has created need for better roads, signs, etc. The principle has been recognized in the administration of federal and state aid. We have given careful consideration to the legality of orders requiring governmental bodies having jurisdiction of highways and streets being subjected to an order requiring their participation in the cost of the protection. We conclude that an order of this commission requiring their participation is of questionable authority. The present statutes give no direct authority for such an order and provide no specific manner in which the state, county, city or town may be ordered or required to participate in such a program. We have made some orders predicated on the basis that the protection would be installed by the railroad company provided the governmental unit or units participated in the cost to an extent specified in the order. This manner of handling has not proved satisfactory.

"We are fully aware of demands being made upon railroad companies for crossing protection, and from observation these demands are increasing from year to year.

"It is our opinion that the City of Estherville should provide street lighting over the tracks of the crossing so that it will be well lighted during the hours of darkness.

"It is our further opinion that the evidence and facts in this matter show a definite need for crossing protection, automatically operated, supplemented by manual control switches for use of trainmen. In accord with past practice and understanding it will be required that back to back flashing light signals with rotating stop discs be provided. A minimum of three such signals

shall. be provided. We will not herein specify details as plans are subject to our approval before installation is made.

"IT IS, THEREFORE, ORDERED that the Chicago, Rock Island and Pacific Railroad Company be and it is hereby required to install, operate and maintain at its own expense on or before December 1, 1949, flashing light with rotating stop discs at the location where Central Avenue crosses six tracks of said railroad company in Estherville, Iowa.

"We find that the City of Estherville should at its own expense provide street lighting over the tracks of the crossing, same being sufficient in volume and intensity to properly light said crossing during the hours of darkness.

"IOWA STATE COMMERCE COMMISSION."

June 7, 1949, the railroad company petitioned the commission for a modification of its order contending, in part, the flagging of trains in accordance with the railroad's bulletin of December 31, 1948, constituted compliance with the resolution of June 28, 1948, and stating:

"The evidence-conclusively shows that respondent has complied with this requirement by placing a flagman on the crossing in advance of each train movement or car, or engine movement over Central Avenue. At the hearing it did not definitely appear that respondent would maintain or was willing to continue indefinitely in the future to provide flag protection for the movement of trains or cars in accordance with the practice then in effect. Respondent now definitely states to the commission that it is willing to continue in effect indefinitely in the future and until such time as there is a substantial and material change in conditions, the present practice of flagging the crossing in advance of any train movement."

June 16, 1949, the city council of Estherville adopted a resolution reciting the proceeding before the commission was tried on the theory the issue was whether automatic mechanical signal devices should be installed, and amending its resolution of June 28, 1948, to comply with the order of the commission of April 8, 1949, by ordering the railroad to install, operate and maintain, flashing light signals with rotation stop discs, etc.

June 20, 1949, the commission denied the petition of the railroad company to modify the decision and order, stating, "After careful consideration of the petition and review of the above mentioned decision and order in this docket, it is our opinion that all matters referred to in the petition were given consideration in our decision and order of April 8, 1949."

May 18, 1950, the railroad company instituted this action in the district court under Code section 474.28 to vacate the order of the commission. The petition alleged the expense of installing the signals ordered by the commission would be $10,000 to $16,000 and the annual cost of maintaining the same $200, the signals would not provide as great a degree of protection as would the practice of flagging for each train, the order is unreasonable, inequitable and unjust and violates section 9, Article I of the Constitution of Iowa and the Fourteenth Amendment to the Constitution of the United States, and particularly the equal protection and due process clauses of said Constitutions.

January 17, 1951, the parties stipulated the cause should be submitted as though the resolution of the city council of June 28, 1948, required the railroad company to construct, maintain and operate signal devices, such as gates, flashers and bells.

March 14, 1951, the trial court rendered judgment as follows:

"Findings of Fact (in part):

"The undisputed evidence establishes that about 7000 vehicles and 700 pedestrians cross the tracks daily, and there are about thirty crossings daily of the plaintiff's engines or trains, rarely exceeding a speed of 15 miles per hour.

"Testimony of numerous witnesses was submitted as to the dangerous nature of the crossing. The plaintiff challenges this testimony on the ground that it is composed of many opinions and conclusions. The court agrees with that contention, but finds that there was sufficient material and competent evidence of these witnesses upon which the defendant commission could find the crossing was of such dangerous character that protection should be provided against the existing dangers and therefore the court will not interfere with that finding.

"The court is of the opinion the jurisdiction of the defendant in passing on the controversy between plaintiff railway com-

pany and the town of Estherville, Iowa, is provided for in section 389.41 and the jurisdiction of the court to pass upon this action is fixed in section 474.28.

"There is no question but what the order of the commission was issued pursuant to a valid delegation of the police power of the state and the order was a valid exercise of that police power, and the commission in the exercise of that power may require reasonable and adequate crossing protection if it is necessary.

"The only question present is whether the order of the commission under the power and authority granted it and the established facts was arbitrary, unreasonable and unjust.

"The commission found the crossing was such that it needed protection, and with such finding the court will not interfere for the reason there was, in the court's opinion, sufficient competent evidence to support that conclusion. It is plaintiff's contention that even if the crossing needed protection, the method of doing so ordered by the commission was arbitrary and unreasonable. Surely the plaintiff cannot seriously contend the crossing needed no protection for it provided for such a few weeks before the hearing by ordering that all its trains stop before crossing the street and a member of the train crew go ahead and flag the crossing.

"The plaintiff does seriously contend that the protection provided by the plaintiff company is ample under the circumstances, and in fact superior to that ordered by the commission. This contention was one which the commission had to decide and they decided it against the plaintiff. The commission then provided in their order what they believed would protect the crossing adequately and ordered the signals installed by the plaintiff.

"At this point the real controversy commences. Was the order of the commission reasonable and just under the circumstances as disclosed by the evidence?

"After an examination of all the evidence before the defendant commission, the stipulation of the parties and the briefs submitted, the court is not prepared to say that the order of the commission is without support in the record, nor is their order arbitrary, unjust or inequitable and therefore the plaintiff's petition should be dismissed at its costs."

Plaintiff-railroad relies upon O'Brien v. Chicago, R. I. & P. Ry. Co., 203 Iowa 1301, 214 N.W. 608. That was an action for damages based upon an accident in 1920 in which the evidence was held insufficient to warrant submitting to the jury the charge the railroad company was negligent in failing to maintain gates, a flagman or warning devices. Of course, an order requiring crossing protection need not be based upon a finding its absence would constitute negligence. Were that the rule there would be few cases in which the railroad could be compelled to protect its crossings and Code section 389.41 would be practically nullified. The O'Brien case indicates that thirty years ago when traffic was only a fraction as heavy as now, there were accidents at this intersection. In addition the record shows the following collisions there with trains, engines or freight cars between July 10, 1946, and the hearing February 24, 1949:

Mr. and Mrs. Edwin O. Berkness, February 21, 1948.

Duane Arthur, April 4, 1948.

Mrs. Eileen Behr, July 10, 1946.

Eugene M. Conmet, April 10, 1947.

Pete Kinney, November 23, 1947.

Near accidents: Orel Young, photographer, fall of 1948; M. L. Dean, highway patrolman, date not fixed; John L. Powers, M. D., August 1948; O. J. McKirchy, office manager, about January 1, 1949, switch engine not flagged at night; Bernard J. Hassel, employee of packing company, August and October 1948; William Tolhurst, January 1949, flagman's light insufficient; Clarence Welp, employee, fall of 1946; Kirt Allen, newspaper editor, about February 1, 1949, no flagman at intersection; Raymond Agard, fall of 1947 and early in 1948. It was stipulated thirty-seven packing house employees, if called, would testify to having experienced similar accidents or near accidents. Witnesses testified to obstructions, diverting circumstances and the difficulty of seeing engines and cars upon the intersection. It will be noted at least two of the near accidents listed above (Tolhurst and Allen) occurred after January 1, 1949, when the bulletin of the railroad, requiring a member of the crew to flag each train, was in effect.

The majority opinion misapprehends various parts of the record. The opinion states: "When the complaint was filed

against the railroad it can readily be inferred that the railroad was in the process of preparing to comply with the resolution of the city council."

The record shows the city 'ordered the railroad to furnish the protection June 28 and filed the complaint with the commission November 20 and that on December 15 the railroad answered admitting, "it has refused to provide the crossing protection referred to in said resolution" and that "a dispute and controversy exists between it and" the city.

The majority opinion continues: "The hearing before the commission was then, pending, and when it was held and at all times thereafter the railroad was stressing the fact that there was then in operation * * * adequate protection to the traveling public. In the face of such a showing *we find little in the record to indicate that the commission gave such matter serious consideration.*" (Italics supplied.)

The italicized language overlooks the record. I quote from the decision and order of the commission which considers this matter as follows:

"A copy of Bulletin No. 29, dated December 31, 1948, was introduced which directed train and enginemen as of January 1, 1949, to provide protection at Central Avenue by a member of the crew preceding the movement of trains or engines with or without cars; also that a section laborer would provide protection for the movements of passenger trains Nos. 19 and 20 and the engines of these trains over this crossing between the hours of 8 a. m. and 5 p. m. daily except Sundays and Holidays. * * * It was additionally stated that applications were constantly being received by the railroad company for the protection of crossings at many locations. The opinion was expressed that the present protection fulfills the need. * * * The recently issued bulletin of the railroad company arranges for protection of various train movements, although the provisions thereof are only in certain respects beyond the scope of the requirements already existing in the operating rules of the railroad company. Advance warning indication that is positive in nature and given sufficiently in advance to the driver of an automobile to afford time for action is not provided under the present protective scheme. We are

confident from past experience that the installation of protection at a crossing does result in a reduction of the accident rate."

The majority opinion continues: "Their ruling seems to be based upon the theory that having ordered the mechanical signal device such finding is final and cannot be questioned on appeal."

There is no support in the record for this statement. The decision and order of the commission, which is set out herein, indicates the commission gave careful and conscientious study and consideration to the case, viewed the various questions objectively and determined them dispassionately. In fact, the decision of the commission compares favorably with many opinions of appellate courts.

The majority opinion states "the commerce commission apparently gave little weight or consideration to the showing and claims by the appellant" relative to stopping and flagging at the crossing as required by Bulletin 29. I have already set out portions of the decision of the commission in answer to a similar charge made by the majority. However, in this paragraph the majority opinion continues: "The same may be said as to the expense of the installation ordered by the commission." The consideration of the question of expense of installations, cost of maintenance, federal aid, etc. occupies more than two typewritten pages of the decision of the commission, hereinbefore set out at length. It is too extended to be repeated. The commission considered also information furnished it in letter form by the railroad. The record does not support the charge that the commission did not give careful consideration to this phase of the case.

The majority opinion states: "The original complaint called for the installation at the crossing in question of either a flagman or a mechanical appliance. That the city council of Estherville regarded as adequate the placing of a flagman at the crossing in question is shown by its resolution of June 28, 1948."

This statement overlooks the fact that the resolution was in the language of the statute and the stipulation of the parties to this case that it should be submitted as though the resolution of the council required the railroad to construct and operate signal devices such as gates, flashers and bells.

The majority opinion continues: "Apparently the commis-

538

sion had the same feeling when it filed the complaint on November 20, 1948." There is no showing the commission had any feeling when the complaint was filed, any more than did this court when the record on appeal was filed herein. The presumption is that the commissioners did their duty and reserved judgment pending the hearing.

Although the various foregoing statements quoted from the majority opinion may not be essential to the decision, the misapprehension of the majority extends to and includes vital factual propositions. The majority opinion states: "There was evidence in the record that the flagman installation was more effective and afforded better protection than would the mechanical appliances ordered by the commission."

Later in the majority opinion this general statement is repeated in substantially the same language. The "evidence" referred to is not specified. There were only four witnesses for the railroad. An assistant to the chief engineer of the railroad testified the 178 Iowa crossings (mentioned in the decision of the commission as being provided with protection) "are protected with either flashing light signals with gates or flashing light signals without gates. * * * This crossing protection is done to protect the public from harm and it also has a protective effect on the railroads because we have had derailments and costly accidents to trains due to their being struck by vehicles." (This officer testified also at some length concerning the selection of intersections to be protected, budgets, expense of installations, federal aid and other related matters, many of which a commerce commission is in a better position to consider and evaluate technically than is a court. These matters are carefully considered in some detail in the decision of the commission hereinbefore set out.)

An assistant superintendent of the railroad testified on cross-examination he had been told by the signalman it would be possible to have an automatic signal on the east three tracks and a manually operated signal on the west three tracks; that in many respects he would say an automatic and manually operated electric signal was superior to a flagman, but he would let the signalmen testify as to what was needed to afford protection at the crossing; that he thought a red light was superior to a white light (which the flagmen were using at this intersection) because it

warned people of danger better than a white light. "Q. Now, if there are red lights on either side of that crossing, bell ringing and flashing, don't you think that would be infinitely superior to what you are doing now? A. It would unless we used a red light."

The division signal supervisor testified he recommended that the three switch tracks be manually controlled with a positive operating section over the entire set: "That is, if a switchman failed to operate the push button, the gates would operate as soon as the first pair of wheels passed approximately the sidewalk." He testified there was some disagreement between officials of the railroad as to the best method of placing such protection.

The division engineer for the railroad, who said he was not a signalman, testified: "Personally, I don't see a great deal of difference over what we are doing there now by this bulletin and the flashlight signals, other than I believe there should be better [street] lighting there." This witness mentioned a hazard at the freight house in the event the automatic signals were installed. Any place traffic comes into a protected street "leaves a blind spot there unless that particular spot is protected." However, it developed the freight house is closed at night and the witness admitted there would be no hazard if there was no one driving there.

The vague statement in the majority opinion "there was evidence in the record" that the protection afforded by Bulletin 29 (which the railroad had belatedly adopted after refusing to furnish any protection) was superior to that ordered by the commission necessarily must have been based upon the testimony of these officials of the railroad. Although the statement in question is technically correct, in that portions of the testimony of one or two of these officials may be so interpreted, their testimony as a whole is weak and uncertain upon that point. The substantial weight of the evidence is to the contrary. Nor is there substantial proof to support the assumption of the majority opinion that the protection now afforded is adequate.

The majority opinion refers at some length to State v. Des Moines & Ft. Dodge Ry. Co., 84 Iowa 419, 420, 51 N.W. 38. The headnote in that case states the court "held, that upon the facts found by the commissioners the order was unreasonable and unjust * * *." In the case at bar the vacation of the order of the

commission is not based upon the facts found by the commission but upon a contrary factual finding made by the majority, under a misapprehension of the record.

The commission, after reviewing the record, found "the evidence and facts in this matter show a definite need for crossing protection, automatically operated, supplemented by manual control switches for use of trainmen." This is the system the division signal supervisor for the railroad testified he had recommended. The record shows the railroad has 178 crossings in Iowa protected by flashing light signals, of which 94 were installed by the railroad at its own expense.

The real basis of the railroad's objection to the proper protection of this intersection is financial. It prayed that the city or other governmental body be required to pay for the protective mechanism. I have already referred to the commission's consideration of these matters as shown by its decision. Fleming v. Richardson, 237 Iowa 808, 844, 24 N.W.2d 280, 299, states:

"While the expense of any police-power regulation is always a matter for consideration (Atchison, T. & S. F. Ry. Co. v. Railroad Commission of California, supra, 283 U. S. 380, 51 S. Ct. 553, 75 L. Ed. 1128, 1138, 1139; State of Washington ex rel. Oregon R. R. & N. Co. v. Fairchild, 224 U. S. 510, 529, 32 S. Ct. 535, 56 L. Ed. 863, 870), it is not ordinarily a valid objection where the regulation is for the protection of human life or limb. It is not a factor in this case."

I would affirm the judgment of the trial court that the railroad company has failed to prove the order of the commission was not reasonable, equitable or just.

GARFIELD and MULRONEY, JJ., join in this dissent.